Joseph C. HOFGESANG, Appellant,

v.

WOODBINE AVENUE REALTY COMPANY et al., Appellees.

Court of Appeals of Kentucky.

March 17, 1967.

As Modified on Denial of Rehearing June 2, 1967.

Ewing L. Hardy, Ben B. Hardy, Louisville, for appellant.

Richard C. Oldham, Fred M. Goldberg, B. C. Van Arsdale, Charles P. Sutt, Jr., Louisville, for appellees.

PALMORE, Judge.

Joseph C. Hofgesang brought this suit to enjoin Woodbine Avenue Realty Company (hereinafter Woodbine Company) and North American Fertilizer Company (hereinafter North American) from obstructing an area he contends has been dedicated to public use as a street. After conclusion of the testimony the circuit court made findings of fact and conclusions of law and entered a judgment denying relief to Hofgesang and awarding Woodbine Company $1,596 on a counterclaim for damages resulting from the removal of its fence by Hofgesang. Hofgesang appeals. The basic issue is whether the evidence to establish a dedication was conclusive, in which case the chancellor's finding in the negative would be "clearly erroneous." CR 52.01.

About 100 years ago Peter J. Marret owned a triangular piece of land containing 24½ acres on the east side of Preston Street in Louisville. In 1875, what was left of it after the sale of a tier of lots facing on Preston Street was partitioned among his heirs. On the plat filed by the commissioners appointed to effect the partition the lots sold are separated from the lots divided among the heirs by a 20-foot alley running parallel with and 150 feet east of Preston Street. Two 60-foot streets, Marret and Peter (now Woodbine), run eastward from Preston Street to the alley and terminate there, Woodbine being 315 feet south of Marret. One of the division lines runs coincident with the center line of Woodbine

Street, if extended, from the alley to the eastern boundary of the Marret tract,[1] which is a line running diagonally southwest to northeast from a point in Preston Street several hundred feet south of Woodbine to a point some distance northeast of the eastern end of Woodbine if extended through the Marret estate.

Hofgesang now owns two lots which together front 213.84 feet on the north side of the *north line* of Woodbine at its eastern extremity if extended. Woodbine Company owns a triangular lot fronting 247.44 feet on the south side of the *center line* of Woodbine at its eastern extremity if extended. Hence the two properties in question, according to the deed descriptions, are separated by a 30-foot strip which is the north half of Woodbine Street if extended. North American owns the property immediately west of Woodbine Company's lot. North American's deeds also call for the center line of Woodbine Street, if extended, as its north boundary.

Several of the various conveyances since 1875 have reserved private easements for ingress and egress along certain portions of Woodbine Street if extended, but except for the possibility that North American has made a dedication by deed, as hereinafter mentioned and discussed, none of the owners of any of the property in the area under dispute ever has made a formal dedication by deed, plat or otherwise, of any part of the street. The first question to be determined is whether a dedication has been proved by evidence of public user.[2] The second is whether, if North American has made an express dedication, Hofgesang is entitled to equitable relief to enforce it.

The titles of Woodbine Company and North American go back to J. Lithgow Smith, who acquired in 1892 the whole triangular parcel east of the alley and south of the center line of Woodbine Street, if extended.[3] Evidently the first use of the areas on both sides of Woodbine Street was for sand pits and then a dump and fill operation. In 1910 or 1911, at the time of earliest eyewitness recollection, the sand excavation was still going on and the dumping had started. Though Hofgesang's brief says a street was maintained and was used by the City of Louisville and the general public, the evidence is that such use was mostly on the business of the owners of the property, who were excavating and selling sand and filling the pits through the operation of a public dump on a fee basis. One witness, Hon. W. J. Hardy, who as a young man lived in the neighborhood during the winter of 1910 and 1911 and used to shoot rats in the dump area, did recall that "people working over at Standard used to come through here and go that-a-way up in Germantown" and that the fire department had to come out frequently to extinguish fires in the dump, but that is about the only testimony of any use of Woodbine Street except for the trade purposes of its owners until about the year 1947.

Hofgesang himself first became familiar with Woodbine Street in 1927. He had wagons and teams of horses and mules with which he collected garbage under contract with the City of Louisville and disposed of it in one or more of the dumps operated by Andy Hoertz and Ben Humpich Sand Company.[4] He and other contractors used

1. Another of the lines is an eastward extension of the center line of Marret Street, which apparently has been opened and is now a public street through what was formerly the Marret tract.

2. "Both the intention of the owner to dedicate and the acceptance by the public may be inferred from use by the public for a substantial number of years." Commonwealth, Dept. of Highways v. Wynn, Ky., 396 S.W.2d 798, 800 (1965). See also

Freeman v. Dugger, Ky., 286 S.W.2d 894, 896–897 (1956).

3. Henceforth in this opinion the qualification "if extended" is omitted, and "Woodbine Street" means the area within an eastward projection of the street as shown on the 1875 plat.

4. Hoertz owned the west portion of North American's property from 1896 until 1936. The Humpich family owned Woodbine

Woodbine Street in entering and crossing the dump area. The city had a contract or contracts with the owners. Other users of the dump paid or were supposed to pay fees according to the size of load. The roadway now in dispute had been built up with ashes and with gravel out of the sand pits. This situation continued until 1939 or 1940.

By 1947 the lands along Woodbine Street had been substantially filled and leveled, and from that point on the evidence conducing to suggest a dedication by way of public user begins to take on a little more life. During that year a firm called Consolidated Contractors purchased what is now the Hofgesang property and constructed two buildings on it, one of which is presently leased by Hofgesang to Ohio Chemical Company and the other is occupied by one of his own enterprises, Eagle Engineering Company. A year or so later Griffin and Company built a manufacturing plant on the property directly to the east of the eastern end of Woodbine Street. The main entrance to Griffin and Company's place is on the other side, but it has a gate in its fence for access to and from the north half of Woodbine Street and for a time had a gate opening into the triangular piece now owned by Woodbine Company.[5]

Both Consolidated Contractors and Griffin and Company and their customers used the north half of Woodbine Street for access to and from the west of their respective properties. The triangular lot now owned by Woodbine Company, which embraces the south half of Woodbine Street, was used by Consolidated Contractors and its customers for parking and for turn-around purposes, without permission or hindrance. According to Hofgesang, ever since 1947

the city has put down rock and asphalt patching, as have Hofgesang himself, Griffin and Company, and other owners to the west. He testified also that from time to time the city fire department would come down the street and conduct training exercises. How often or regularly these activities by the city took place he did not say.

Hofgesang succeeded to the title of Consolidated Contractors in 1952. Woodbine Company purchased the triangular lot (formerly owned by the Humpich family) in 1963. William J. Griffin, chairman of the board at Griffin and Company, is president and one-third shareholder of Woodbine Company, which affiliation no doubt explains why Woodbine Company is able to fence its north line without doing itself more harm than good. The harm done to Hofgesang is that the arrangement of his buildings with respect to the north line of the street opposite the Woodbine Company lot is such that he needs the full 60 feet in order to get large trucks in and out of the premises and will suffer considerable inconvenience and damage from being limited to 30 feet.

■ Numerous maps and plats were introduced, including the master plan for Louisville and its environs,[6] maps maintained by the city's department of public works, and unofficial plats from the files of the Louisville Title Company, on which Woodbine Avenue is indicated as a public street. So were an 1884 "Atlas" and several city directories of various antiquity. All of these were objected to but were admitted for what they were worth. Obviously, of course, if the owner of property has never dedicated it or suffered it to become a public way by prescription, no amount of map-making by others can make it one. On

Company's property most of the time from 1893 until 1952.

5. To be exact, Griffin and Company's fence and gates are separated from the Hofgesang and Woodbine Company lots, and from the end of Woodbine Street, by a 10-foot alley running diagonally from southwest to northeast along what formerly

was the east boundary of the Marret tract. Though used extensively in the dumping days, this alley is now grown up in weeds. Its status is not in controversy here, nor is the status of the north half of Woodbine Street.

6. Cf. KRS 100.046 et seq.

the other hand, it may be conceded that the adoption of an official map by ordinance [7] constitutes acceptance of streets shown on it if they have been dedicated. Sullivan v. City of Louisville, 291 Ky. 60, 163 S.W.2d 17, 19 (1942).

Other witnesses for Hofgesang testified that Woodbine has been freely and extensively used during their various periods of observation since 1947, but Hofgesang himself admitted that those who used it were people who came to do business with the occupants of the abutting premises, and that there is "no through traffic. They turn around on lot 23." [8] With particular reference to the Woodbine Company lot, including the south half of Woodbine Street, it would therefore seem reasonable to conclude that the users other than the owner and its customers were not the general public, but the occupants of Hofgesang's property and their customers. This distinction is of importance because Hofgesang's claim is founded on the establishment of a public right through dedication, and not the acquisition of a private easement by prescription.

The factual situation in respect to North American is different from that which exists with regard to Woodbine Company. North American owns all of the property on the south side of Woodbine Street from Woodbine Company's west line to the 20-foot alley lying 150 feet east of Preston Street except for the right-of-way of Jackson Street, which was relocated in 1953 and cuts through Woodbine Street in a north-south direction. North American acquired some of this property in 1936 and the rest in 1945. Both descriptions run to the center of Woodbine Street if extended, and in 1945 North American erected a chain link fence along that line. East of Jackson Street the fence has remained in place continuously until the present. It follows, of course, that since 1945 there cannot have been any public use of the south half of Woodbine Street east of Jackson Street except for that portion which is or was a part of the Humpich lot (now Woodbine Company).

On August 6, 1953, contemporaneously with negotiations relating to the right-of-way for Jackson Street, North American's board of directors adopted a resolution authorizing its president to execute in favor of the City of Louisville a deed dedicating for public use as a street the south 30 feet of Woodbine Street from the 20-foot alley eastwardly to the line of what is now the Woodbine Company lot. The deed was prepared and an unexecuted carbon copy of it has been found in the files of the draftsman. On September 11, 1953, the board of aldermen of the city adopted a resolution reciting that the dedication had been made and accepting it. However, the deed was not put to record and cannot be found; the then president of North American is deceased; and no one was able to testify from personal knowledge that the deed actually was signed and delivered.

In his findings of fact and conclusions of law the chancellor did not mention the question of whether North American had made a dedication by deed, and he overruled Hofgesang's motion that this omission be supplied by amendment of the findings and conclusions. Thus we are prevented from a review of his judgment in this respect without remanding the case, unless the question can be resolved as a matter of law. Cf. Perry v. McLemore, Ky., 414 S.W.2d 141 (decided February 10, 1967).

"It is settled that dedication is a matter of intention." Smith v. City of Kuttawa, 222 Ky. 569, 1 S.W.2d 979, 985 (1928). "The intent of the dedicator is the foundation and life of all dedications, and the intent must be clearly and unequivocally manifested." 11 McQuillin, Municipal Corporations § 33.36, at 719 (3d ed. rev. Ellard

7. The official maps of the City of Louisville adopted from time to time by ordinances show Woodbine Street as a public street.

8. Lot 23 is the triangular lot owned by Woodbine Company.

1964). "And, of course, the term 'intention' as it is used in the context of this rule is not to be taken in the sense of an actual intent, inasmuch as the basis of a common-law dedication often rests on mere conduct of the owner of land relied on by others to their injury so as to constitute an estoppel against the owner, and effectuate a dedication notwithstanding that there was never in the mind of the owner any actual intent to dedicate, the theory being that the owner must be held to intend the reasonable and necessary consequences of his acts. In other words, the acts of the owner must either be such as to show an intent to dedicate, or such as to estop him from denying that such was his intent * * * In brief, the intent may be actual or presumed, as in other branches of the law where intent is material." Id. § 33.29, at 696–697.

■ As heretofore indicated (footnote 2), both intention to dedicate and acceptance can be established by evidence of public user. However, the user must be by the general public. Id. § 33.50, at 767. "When the appropriation is for the use of particular persons only, and made under circumstances which exclude the presumption that it was intended to be for public use, it will not amount to a dedication." Hall v. McLeod, 59 Ky. (2 Metc.) 98, 104, 74 Am.Dec. 400 (1859). So, in accordance with this principle, it was held in Foulk v. City of Louisville, 270 Ky. 828, 110 S.W.2d 665 (1937), that a private alley was not made a public alley through use "by the owners of property abutting on the alley, by delivery trucks, coal trucks, and other conveyances belonging to parties having business with abutting owners, by children going to and from the Holy Cross school, by rag pickers and people of that character, and by the contractor who constructed Hazel street." See also Louisville & N. R. Co. v. Whittle's Adm'r, 216 Ky. 314, 287 S.W. 894 (1926), and Rominger v. City Realty Company, Ky., 324 S.W.2d 806, 808 (1959), in which the same distinction was observed.

■ It seems clear to us that the proof in this case falls far short of establishing, as a matter of law, dedication through acquiescence in public user. When the abutting property was being used for the excavation and sale of sand and filling of the pits with garbage, the main traffic on Woodbine Street was on the business and for the convenience of the owners, and this has continued to be true with the changes in ownership and character of business since 1947. It makes no difference if the city has made sporadic use of or repairs to the street. Cf. City of Irvine v. Smith, 304 Ky. 868, 202 S.W.2d 733, 734 (1947). There is no real evidence in the case that the city has ever assumed or exercised such physical dominion over the street that it would be reasonable to conclude or presume that the abutting owners had come to regard it as a public property. Hofgesang cites the existence of a utility line, but it runs along the northern 30 feet of the street, whereas this litigation is confined to the south 30 feet. We are not called upon to determine the status of the north 30 feet.

■ It is extremely doubtful that the evidence as a whole was sufficient to support a judgment favorable to Hofgesang had it been granted, but as that is not the question before us we do not decide it. We do hold that the evidence does not establish conclusively, so as to force a judgment, that any part of the south 30 feet of Woodbine Street east of Jackson Street has become a public street by way of user.

The decisions discussed in the briefs for Hofgesang have been carefully examined, and they are all sound, but each of them involved a user by the general public and is therefore distinguishable on the salient facts.

Coming now to the factual situation applicable only to that portion of Woodbine Street which is enclosed by North American's fence, we find it unnecessary to decide whether the evidence demands a conclusion that the deed of dedication prepared

in 1953 actually was executed or, if not, whether a dedication took place anyway.

■ It is the general rule in this state that a property owner within the block where a street has been obstructed suffers an injury distinct from that suffered by the general public and is therefore entitled to injunctive relief in his own right. Volpenheim v. Westerfield, 216 Ky. 157, 287 S.W. 545, 546 (1926). And in Morrow v. Richardson, 278 Ky. 233, 128 S.W.2d 560 (1939), it was held that the owners of property abutting on a dedicated street could enjoin its obstruction even though it had not been accepted by the city and actually had not been opened to public travel. However, we have not found any case which in fact or principle is exactly like this one.

■ When a street has been dedicated to the general public but has not been accepted by the corporate public authority, cf. Morrow v. Richardson, supra, there may be some reason why equitable relief to have it opened should be available to a private citizen.[9] But when the dedication occurs solely by virtue of a direct transaction between the owner and the public authority, it seems to us that ordinarily the public authority should have the exclusive right to decide if, when, and to what extent obstructions existing at the time of the dedication will be removed. In fact, unless Morrow v. Richardson be construed to the contrary,[10] that may be the law even if the dedication has been effected in another manner. See, for example, Chicago, St. Louis, New Orleans Co. v. Dixon, 215 Ky. 353, 284 S.W. 1091, 1093 (1926), in which it was said:

"It is argued * * * by appellees that the reservation in the deed * * * put the railroads upon notice, if it did not actually acknowledge the right of the city to open streets over and through the property * *. If the reservation * * * is enforceable * * * the city alone could do so, and it does not lie in the power of an individual, even though a citizen and property holder in the city,[11] to enforce such right on his own behalf independently of the municipality." (Footnote added.)

■ It is common knowledge, hence a matter of judicial notice, that in many instances cities have never found it necessary or desirable to utilize the full width of streets as originally laid out, and abutting owners have continued to occupy and even place improvements on the unused portions. Unquestionably a city may exercise the public right whenever it chooses to do so,[12] but in the absence of some special circumstance showing otherwise we find it difficult to understand how any individual citizen suffers a special injury from being deprived of something he never had in the first place.

■ When the 1953 dedication was made, if it was made, North American's fence was already in place. For ten years thereafter no one was moved to complain of its continued presence. The city has never evinced a desire to have it removed. Hofgesang makes no claim that he purchased his property in reliance upon the deed of dedication. It is our conclusion that he simply does not show the special injury that is essential to justify injunctive relief at the suit of a private individual. It follows that the chancellor's omission to find whether the 1953 deed was executed is immaterial and that his judgment denying relief against North American was correct.

On the eve of this litigation Woodbine Company put up a chain link fence along its

---

9. As, for example, when the individual has purchased property in reliance upon a plat. See Salyers v. Tackett, Ky., 322 S.W.2d 707 (1959).

10. The fence in Morrow v. Richardson was erected subsequent to the dedication, though it replaced one that had been there at the time of the dedication.

11. The complainant was an abutting owner.

12. Cf. Shurtleff v. City of Pikeville, 309 Ky. 420, 217 S.W.2d 976 (1949).

north border on the center line of Woodbine Street. Shortly thereafter it was wrecked by a bulldozer owned by Hofgesang. Woodbine Company then had the fence put up again and hired guards to protect it. When Hofgesang filed suit he procured a mandatory injunction requiring Woodbine Company to remove the fence, which it did. Woodbine Company's counterclaim demanded $25,000 in damages for its expenses in connection with the replacement and protection of the fence and for the loss of use of its space within the area the fence was intended to close off. In the judgment Woodbine Company's recovery was limited to $1596, $1496 of which was for the expenses of replacing and repairing the fence in the first instance and $100 of which was for the expense of removing it pursuant to the injunction.

Hofgesang contends the evidence was not sufficient to authorize the award. Except for the $100 we think it was. Mr. Griffin testified that on August 23, 1963, Griffin and Company paid Falls City Fence Company $1,496.76 for the fencing, and that Woodbine Company later reimbursed Griffin and Company in the amount of $1,-281.18 and now owes it the balance. Although the question to which this information was given in response did not expressly and in so many words confine it to that fencing only which was purchased and erected in replacing the first fence, we do not think it was unreasonable for the chancellor to assume it. If there was any question in that respect it could and should have been raised on cross-examination, but was not.

There was nothing in the evidence to support the allowance of $100. The judgment should be modified to delete it.

As modified in accordance with this opinion the judgment is affirmed.

WILLIAMS, C. J., and MILLIKEN, MONTGOMERY and STEINFELD, JJ., concur.