Frances **CUMMINGS**, Appellant,

v.

**FLEMING COUNTY SPORTSMEN'S CLUB,
INC.**, Appellee.

*Court of Appeals of Kentucky.*

Feb. 4, 1972.

Lloyd A. MacDonald, MacDonald & Walton, Flemingsburg, Amos H. Eblen, Eblen, Howard & Milner, Lexington, for appellant.

Richard L. Hinton, Flemingsburg, for appellee.

PALMORE, Judge.

The appellee, Fleming County Sportsmen's Club, Inc., hereinafter called the Club, brought this action to enjoin the appellant, Frances Cummings, from obstructing a passway leading from a public highway to a 6-acre tract of land owned by the Club. Mrs. Cummings appeals from a judgment granting the injunction, based upon a finding that the passway had become a public way through public use for the statutory period of 15 years. It is our conclusion that the evidence does not reasonably support such a finding and is therefore clearly erroneous. CR 52.01.

The passway in question runs westwardly from Kentucky Highway 11 in Fleming County. The highway runs north and south. The passway provides access into a farm formerly owned by one Sanders Ringo and is called the Ringo road. Whatever may be its present status, it originated as a private passway, and that part of it now in controversy was a part of the Ringo land. Mrs. Cummings is one of the Ringo descendants and owns the Sanders Ringo place.

The Club's tract is the west or back portion of what we shall call the Moran tract, which comprised 12 acres fronting on the

west side of Highway 11. Ringo road runs along the south line of the Moran tract and thence farther into the Ringo (now Cummings) property, which borders the west and south sides of the Moran tract. Insofar as we are now concerned the Moran and Ringo properties do not have a common source. The Moran tract was never a part of the Ringo ownership.

The Club purchased its six acres from John Graham, Jr., in 1964. Graham had purchased the 12-acre Moran tract from Ruth and Alex Fulton and Grace Crain in 1959. The Fulton-Crain title came through a 1953 deed from the Moran heirs.

Since it fronted on the highway, so long as the Moran 12 acres remained intact there was no occasion or necessity for its owners to use Ringo road for access to their own property. As a matter of fact, some of the previous Ringo and Moran owners had long ago constructed a boundary-line fence along the north side of Ringo road, closing it off from the Moran tract, and the remains of this old fence still existed when the Club purchased its six acres from Graham in 1964. Graham, however, was under the impression that Ringo road was a public way, and although he admitted that he recognized the old fence as marking his south boundary line, in his deed to the Club he described the property conveyed as bounded on the south by the center of Ringo road and made no provision for access to Highway 11 through that portion of the Moran tract which he retained, and which lay between the Club property and the highway. Despite the old fence, which evidently was pretty well broken or fallen down by that time, Graham testified that from the time he acquired the Moran tract (1959) he freely used Ringo road to reach its rear portion. On the other hand, Fulton, his immediate predecessor in title, testified that he had never used Ringo road for such access, as follows:

"My right of way came out on the main highway down there, there was a gateway there and everything. I did not use it, I didn't have no right to use it for it didn't belong to me. There was a fence on both sides of their road coming down through there. I had no way to get to mine from hers, there was a fence on both sides of the road."

Fulton's co-owner, Grace Crain, her husband, and an elderly member of the Moran family who once lived on the Moran tract all testified to the same effect.

When the Club purchased its six acres from Graham (1964), one of the members, being concerned with respect to the status of Ringo road, went to a lawyer who represented Mrs. Porter (Mrs. Cummings' mother, who then owned the Ringo property) and inquired about it. After consulting with Mrs. Porter the lawyer told the Club's representative that she did not want the road torn up, but if the Club or the county would take care of it the Club could use it. R. C. Donahue, president of the Club at the time of the purchase from Graham, testified that shortly thereafter Mrs. Cummings and her mother, Mrs. Porter, came to see him and told him they owned the road and if the Club was going to use it "we had to upkeep it and I agreed to that." He therefore presumed that the Club's use of Ringo road was with their consent. As Herd Shrout, secretary of the Club, explained it, "that was when we first went out there; that we would sort of take care of the road for the use of it."

Now to digress for a moment. The Club's complaint, filed on October 19, 1968, alleges that "plaintiff and its predecessors in title have freely, openly, notoriously and adversely used the Ringo Road which leads from Kentucky Highway 11 to the realty of the plaintiff as a means of ingress and egress from and to their realty for a period of over 15 years." This allegation, which in substance is that the Club and its predecessors in title have acquired a private easement by adverse user, is conclusively refuted by the evidence. The judgment, however, finds that from the highway to a gate west of the Club's club-

house building Ringo road is a *public* way, "used for long years as a roadway to the area now occupied by the clubhouse." Thus the judgment does not follow and is not supported by the pleadings, because nowhere in the pleadings was it alleged or suggested that Ringo road is or ever was a public road. Nevertheless, since the parties tried the case and have briefed it here as if that were the issue we shall decide it on that basis.

■ It is undisputed that until the early 1930's when Highway 11 was constructed along the route of the old Maysville-Mt. Sterling Turnpike, the Ringos maintained a "Patent" gate at the entrance to Ringo road at the turnpike. It was kept closed. Other gates were and still are located farther back. When the new road was built a deep cut was made at this entrance, which therefore had to be relocated. As relocated, the entrance now runs at an angle along part of the old turnpike and cuts across the extreme southeast corner of what was theretofore the Moran tract. According to Mrs. Cummings, the new approach was constructed by the state highway department, but just how much of it came off the Moran tract and whether it was paid for by the state are questions not answered in the evidence. Anyway, instead of replacing the gate Dave Porter (father of Mrs. Cummings) put a fence along the south line of Ringo road from the highway to a point some distance to the west of where the Club's building now stands, at which point he installed a cattle guard. Thereafter, and until some time after 1964 when the Club removed the old line fence along its north side, Ringo road from the highway to the cattle guard lay between two fences, the old line fence and the newer fence erected by the owners of the Ringo property.

The overwhelming weight of the evidence is that Ringo road is and always was a private passway. Sanders Ringo had it rocked from the old turnpike in to his residence, and beyond that it was a dirt road leading to the fields and tenant houses. As one of the witnesses said, "It has to be a private road it didn't go nowhere but to Uncle Sanders." Naturally, it has been freely used by anyone having occasion to do business with or pay social calls on the occupants of the property, but since it did not lead to any place in which the general public would have had an interest in going, there could scarcely have been much if any occasion for the general public to use it.

Since this proceeding was commenced on October 19, 1968, it was necessary for the Club to prove adverse user of Ringo road by the public for some uninterrupted period of 15 years before that time. It cannot be seriously contended that such a user took place before the early 1930's when Highway 11 was constructed and Dave Porter removed his gate. The evidence introduced for the Club with respect to the situation since that time was as follows:

*Dick Smith*, a neighbor, had used Ringo road since 1950 for the purpose of feeding and farming on the Ringo lands. He said it is a private road except for plenty of "drinking and lollygagging".

*Chesley Hunt*, a member of the Club, said he knew the public had been using the road since 1960. For what purpose he did not say. Based on what he had heard from other people, he testified (over objection) that the road had been "open" for 25 or 30 years or longer. This, incidentally, is the witness who went to Mrs. Porter's lawyer to ask about the status of the road.

*Cecil Glascock* had been familiar with the road since 1934. It was always open "and everybody traveled it," but he did not know whether it was used by the general public. When he went in to the property himself, it was to do work with one or more of the occupants or to fish, with consent of the owners.

*R. E. Donahue,* president of the Club when it purchased part of the Moran tract, used the road in 1950, 1951 or 1952 to go hunting with some brothers named Tribby.

That was the only time he traveled it before 1964.

*Tommy Emmons* had lived from 1943 to 1950 on part of the farm land served by Ringo road. At that time no one used it except "us and Mr. Dave" (Dave Porter, father of Mrs. Cummings) and people "coming over there to work or something like that." There were three or four gates beyond the cattle guard, and the road did not continue through to Three Mile Road (a public road located some distance to the west and beyond the Ringo property). So far as he knew, it was then a private road and during his tenancy the owners bought rock and graded it.

*Ora Dale McIntosh* testified that in 1932 or 1933 (when he was a young boy) he drove some cattle through the road from Three Mile Road. He did not know whether it was public or private, and used it only because he was so instructed by Gano Hendrix, the man for whom he was driving the cattle.

*John Graham, Jr.,* the Club's vendor, had always been told it was a public road and thought it was a county roadway. After purchasing the Moran tract he used it for access. He had used the road "off and on" since 1950 (at which time, as we figure it, he was 11 or 12 years old), explaining as follows: "Traveling through that country there. Used to have an old jeep and get on the side roads. No drivers license was one reason." He could not say whether it was used by the general public.

*Charles "Jack" Tribby's* great grandparents once owned the Moran tract. He indicated that the approach from Highway 11 into Ringo road is on the public right-of-way ("It's county now, but it came off the Moran place."). He said "they got part of it off the Moran place and part of it was off the Ringo place." Tribby had not been there much since the early 30's. At that time anyone who wanted to use the road did so, but he could not say whether any such use had been adverse to the owners.

*Boronlo Jones,* a state conservation officer, had been in Fleming County for 10 years, during all of which time he said Ringo road had been open to the public and he had used it for the purpose of checking on hunters. In his official capacity he has the authority to go on private lands.

*Herd Shrout,* secretary of the Club when its land was purchased from Graham, first used Ringo road in 1955 or 1956, when he went in to see someone about the payment of Legion dues. He said he knew other people had been traveling the road for "the past 15 years" (the proof was taken in 1969) and that he personally had used it openly and adversely "for the past 15 years" (thus contradicting his previous statement that he had first gone there in 1955 or 1956).

*Robert S. Stokely,* County Judge of Fleming for the past 24 years, and three present or former county road employes testified as rebuttal witnesses. Judge Stokely said that on several occasions beginning in 1942 the county had graded and rocked Ringo road from the highway to the residence, but that this was done at Dave Porter's request and as a courtesy to him. He said that Porter told him it was an old county road, but to his knowledge there had never been a conveyance or dedication to the public, and in having the work done by the county it was not his intention to claim the road as a public way. He conceded that in numerous instances the county had done this type of work on private property. The other rebuttal witnesses testified about county work at various times on the road, but none of them professed to know whether it was a public or private road except to the extent that one said he understood it was public by reason of the fact that the county was doing the work.

In addition to the information to be gleaned from these witnesses, counsel for the Club attaches some importance to the fact that in the 1929 deed by which part of

the Ringo land was conveyed to Mrs. Cummings' mother the road in question was referred to as the "metal turnpike" leading from the home to the old turnpike. At that time it was rocked from the highway to the house, and from there on back it was a dirt road. We see no real significance in this use of the word "turnpike", especially in view of the utter absence of any other evidence that the road was anything but a private passway at that time.

Nor does it make any difference that some or all of the relocated entrance to Ringo road came off the Moran tract. At best, the circumstances surrounding this relocation might reflect what the parties understood at the time, and possibly could provide the basis for an estoppel, but without knowing more about those circumstances than is disclosed by this record we are of the opinion that the evidence is irrelevant and without any probative significance.

■ It is well settled also that the acts of county officials in making improvements do not convert private roads into public ones. Luscher v. Lewis, 245 Ky. 64, 53 S.W.2d 170, 173 (1932). Cf. Hofgesang v. Woodbine Avenue Realty Company, Ky., 414 S.W.2d 580, 585 (1967).

■ Broadly speaking, the public may acquire an easement by adverse user of the same character, continuity and duration as would be sufficient in the case of a private individual. However, the acquisition of an easement in this manner differs from the acquisition of absolute and exclusive corporeal title by adverse possession in that the scope or quantum of rights thus acquired is limited by the extent to which the adverse user is inconsistent with the dominion and consent of the owner. Hence it is that whereas exclusivity is one of the requisites

of adverse possession, it is not necessary with respect to the adverse user that will ripen into an easement. "In case of a public easement . . . . the use by the owner, along with other members of the public, does not prevent the public user from being adverse or exclusive in the legal sense. The public use need only be such as to show a claim of right to use the land as a highway to the exclusion of any individual right of the owner inconsistent therewith." 39 Am.Jur.2d 422 (Highways, Streets and Bridges, 326).

■ Nevertheless, one of the fundamental requisites of adverse possession is that it be so manifest as to afford notice to an ordinarily prudent owner. George T. Stagg Co. v. Frankfort Modes Glass Works, 175 Ky. 330, 194 S.W. 333, 336 (1917); Buford v. Cox, 28 Ky. (5 J. J. Marsh.) 582, 589 (1831). Obviously the same principle must apply to the acquisition of an easement by user. In more primitive times, when roads were scarce and travel difficult there were good reasons for liberality in measuring the quantum of evidence required for the establishment of a public way, but those reasons certainly do not exist today. Cf. Snyder v. Carroll, 203 Ky. 320, 262 S.W. 290, 292 (1924). Even under a more liberal approach we do not see how the evidence in this case could measure up. It is miles short.

Mrs. Cummings asserted a counterclaim for damages resulting from the destruction of the old line fence and certain signs she had erected. It will of course be necessary for the trial court to pass on this claim in entering a new judgment.

The case is reversed and remanded with directions to enter a judgment for the appellant.

All concur.