**EDUCATIONAL TRAINING SYSTEMS, INC. d/b/a A–Pass Weikel Institute, d/b/a Weikel Business Schools, d/b/a Weikel Real Estate Sales Schools, Appellants,**

v.

**MONROE GUARANTY INSURANCE COMPANY, Weikel Academy of Realty, Inc., d/b/a World Academy of Realty, Inc., and Earl W. Weikel, Appellees.**

No. 2002–CA–001798–MR.

Court of Appeals of Kentucky.

Aug. 15, 2003.

Discretionary Review Denied
April 15, 2004.

Dennis McKiernan, Louisville, KY, for appellants.

Richard P. Schiller, Ben T. White, II, Louisville, KY, for appellees.

Before BARBER, McANULTY, and TACKETT, Judges.

## OPINION

TACKETT, Judge.

Educational Training Systems, Inc., ("ETS") appeals from the decision of the Jefferson Circuit Court granting summary judgment to Monroe Guaranty Insurance Company ("Monroe") on the issue of whether Monroe had a duty to defend Weikel Academy of Realty, Inc. ("Weikel Academy") and Earl Weikel in an action by ETS for infringement of its service mark, "A–Pass Weikel Institute". The circuit court concluded that Weikel Academy acted with intent to confuse its service mark with that of ETS, with intent to harm ETS, and that therefore an exclusion in the Monroe policy operated to relieve Monroe of its duty to defend and its obligation to provide coverage. ETS appeals, arguing that Earl Weikel acted under the mistaken impression that he had an unfettered right to use his own surname, and that therefore he did not act with intent to violate the law. We disagree and affirm.

ETS operates the A–Pass Weikel Institute, which offers courses for prospective realtors and real estate professionals. Earl Weikel ("Earl") and John Weikel II ("John") are the sons of the late John J. Weikel, founder of ETS. On John J. Weikel's death, the controlling interest in the business passed to John, who dis-

charged his brother Earl. In apparent retaliation, Earl mailed the following letter to John's attorney Dennis McKiernan:

I am writing to you today to ask that you convey the enclosed Non–Compete Agreement to your client John J. Weikel II, owner of Education Training Systems, Inc. This offer has a limited time for consideration by both parties. For many years I have devoted my life and career to becoming the best and I feel I have a lot to offer the real estate education profession. My knowledge of the inner workings of the real estate education profession leads me to believe that my skills and knowledge would command at least the $300,000.00 ($30,-000.00 X 10 years) that I herein request. I believe you know that a competing school such as Career Development Center (Tom Lambeth), Family Style School (William Sellinger), or some real estate school yet to be established, would profit greatly with WEIKEL as part of it's name. The ensuing loss of income to A–PASS–WEIKEL INSTITUTE would be unfortunate, but necessary to my personal financial success. Under no circumstances will a payment plan be considered [sic] from your client as I do wish to sever all ties to A–PASS–WEIKEL INSTITUTE at the signing of the enclosed agreement. I require a response by 5/21/99 as I have other possibilities to consider. This is the real estate education industry's prime time of the year and I cannot wait to pursue this matter. This offer is being made in complete confidentiality.

John did not respond to the letter, and Earl acted on the intent expressed in the letter and founded Weikel Academy. ETS filed suit against Earl and Weikel Academy, alleging infringement of ETS's trademark in violation of the Lanham Act, 15 USC 1051 et seq.

The circuit court granted summary judgment on the issue of liability, finding that Earl founded Weikel Academy with the intent of confusing his business name with that of the A–Pass Weikel Institute. Monroe then filed a motion to intervene, seeking a declaration that the exclusions in Monroe's policy applied and that Monroe had no duty to defend and no obligation to provide coverage. The circuit court granted Monroe's subsequent motion for summary judgment, and this appeal followed.

The relevant exclusions contained in the policy read as follows:

COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

2. Exclusions

This insurance does not apply to:

a. "Personal and advertising injury":

(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

SECTION V—DEFINITIONS

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

f. The use of another's advertising idea in "your advertisement";

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement";

There is also a provision that excludes coverage for intentional acts that result in bodily injury or injury to tangible personal property. However, as the injury in this case occurred to intangible personal property, then that exclusion has no application here, and so we limit our discussion to the exclusion contained in Coverage B above.

■ It is clear from the language of the policy that this coverage does not apply to injury "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury'...." The question then becomes, did Monroe, by use of the particular evidence of the letter from Earl to John's counsel, establish the intentional act with the knowledge that the act would infringe ETS's trademark?

■ Summary judgment, under Kentucky law, is appropriate only when controlling facts are not in dispute, and no genuine issue of material fact exists to be decided by a finder of fact. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476 (1991). Questions of intent are usually left to the finder of fact, although there are circumstances when even questions of state of mind can be decided by summary judgment. *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.*, Ky., 814 S.W.2d 273 (1991). One such case was relied upon by the circuit court in this case, *Employers Ins. Co. of Wausau v. Martinez*, Ky., 54 S.W.3d 142 (2001). In *Wausau*, the Kentucky Supreme Court held that intent to violate a criminal statute could be inferred even in the absence of a conviction for the offense described in the statute. While *Wausau* is an extreme case, in which a cemetery company was found liable for systematically reusing a huge number of graves in violation of several criminal statutes over an almost hundred-year period, the logic behind it is applicable to this case. Here, one piece of evidence quite plainly illustrates Earl Weikel's intent to harm ETS through the deliberate use of the Weikel name. The circuit court held that in this case, as in *Wausau*, the evidence of Earl's intent was so plain from the letter to John's counsel that it was properly the subject of summary judgment.

At oral argument, counsel for ETS asserted that the policy exclusion requires knowledge that the conduct will violate the rights of another, in addition to the intent to cause harm. According to counsel, the circuit court skipped the first part of this analysis and decided the case based on the evidence of the second part. However, the policy exclusion reads differently, and requires "knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury' . . . ." The policy exclusion never uses the word "intent", because, as Monroe's counsel pointed out at oral argument, "advertising injury" necessarily encompasses intent, since the actor by definition intends the advertisement. It is in the knowledge that the intended act will cause harm that the exclusion is triggered. "Advertising injury" is defined in the policy as stated above, and the evidence in the case *sub judice* indicated a clear intent to cause that injury. However, the act itself must also be done with knowledge that it will violate the rights of another, and here, ETS argues that since Earl advanced arguments in the underlying case that he had an unfettered right to use his surname, he could not have had the knowledge that the conduct would violate the rights of another.

 We disagree. The knowledge of the illegality of the conduct may be imputed to the actor. In this case, the actor knew of the trademark, knew that his use of the trademark would cause confusion (as evidenced by the statement "a competing school ... would profit greatly with WEIKEL as part of its name,") and knew that harm could result from his intended act. All that is missing is the subjective knowledge that the conduct itself is in violation of the provisions of federal law, and that must, for reasons of public policy, be imputed to the actor. "[I]t is axiomatic that all persons are presumed to know the law." *Midwest Mut. Ins. Co. v. Wireman,* Ky.App., 54 S.W.3d 177, 181–82 (2001).

Further, ETS's efforts to rely on the pleadings filed in the circuit court as proof of Earl's lack of knowledge are unavailing. As ETS is aware, pleadings are not evidence, and to us illustrate nothing greater than a misunderstanding of the law on the part of Earl's counsel in the underlying action. They are in no way admissible evidence of Earl's state of mind, and we reject ETS's efforts to use these pleadings as proof of the same.

For the foregoing reasons, the judgment of the Jefferson Circuit Court is affirmed.

ALL CONCUR.