Ronnie CARY and Grace
Cary, Appellants

v.

PULASKI COUNTY FISCAL COURT;
Linus Keeney; Freda Keeney; Betty
Jane Smith; Mary Elizabeth Steven-
son; Charles Allen Stevenson; Noel
Gene Stevenson; Gayle Davis; Lora
Ellen O'Brohta; Anthony Coral Ste-
venson; Warren Shannon Thompson;
Warren Cook Thompson; and James
P. Thompson, Appellees

and

Don Cooper and Cathy Cooper,
Appellants

v.

Pulaski County Fiscal Court;
John Bruner; and Beth
Bruner, Appellees

and

Ronnie Cary and Grace
Cary, Appellants

v.

Pulaski County Fiscal Court; Linus
Keeney; Freda Keeney; Betty Jane
Smith; Mary Elizabeth Stevenson;
Charles Allen Stevenson; Noel Gene
Stevenson; Gayle Davis; Lora Ellen
O'Brohta; Anthony Coral Stevenson;
Warren Shannon Thompson; Warren
Cook Thompson; and James P.
Thompson, Appellees

and

Mary Elizabeth Stevenson; Charles Al-
len Stevenson; Warren Cook Thomp-
son; Warren Shannon Thompson;
and James P. Thompson, Cross–Appel-
lants

v.

Ronnie Cary and Grace Cary,
Cross–Appellees.

Nos. 2011–CA–002272–MR, 2011–CA–
002274–MR, 2012–CA–000187–MR,

2012–CA–000226–MR.

Court of Appeals of Kentucky.

June 7, 2013.

Rehearing Denied Jan. 16, 2014.

Matthew J. Baker, Bowling Green, KY, for Appellants, Don and Cathy Cooper, and Appellants/Cross–Appellees Ronnie and Grace Cary.

Martin L. Hatfield, Marcus L. Vanover, Somerset, KY, for Appellee, Pulaski County Fiscal Court.

Scott T. Foster, Somerset, KY, for Appellees, John and Beth Bruner.

John T. Mandt, Somerset, KY, for Appellees/Cross–Appellants Warren Shannon Thompson, Warren Cook Thompson, James P. Thompson, Mary Stevenson and Charles Stevenson.

Before CLAYTON, MAZE, and MOORE, Judges.

*OPINION*

MOORE, Judge:

These consolidated appeals each concern roads situated in rural Pulaski County, Kentucky, and disputes between abutting owners of those roads and the Pulaski County Fiscal Court as to whether the roads are properly categorized as either private passways, or "county roads." As defined in Kentucky Revised Statute (KRS) 178.010(1)(b), "county roads" are

> public roads which have been formally accepted by the fiscal court of the county as a part of the county road system, or private roads, streets, or highways which have been acquired by the county pursuant to subsection (3) of this section or KRS 178.405 to 178.425. "County roads" includes necessary bridges, culverts, sluices, drains, ditches, waterways, embankments or retaining walls[.]

These appeals originated as declaratory actions in Pulaski Circuit Court. In each the circuit court granted summary judgment, ruling that the roads in question constituted county roads rather than private passways. For the reasons detailed below, we reverse and remand the appeal of the matter designated 2011–CA–002274, but affirm those matters designated 2011–CA–002272, 2012–CA–000187, and 2012–CA–000226.

## APPEAL NO. 2011–CA–002274–MR

### I.  Factual and Procedural History

The road that is the subject of this appeal is generally known as "Edward Meece Road." It passes through and is bounded on both sides by property owned by Don and Cathy Cooper, and, aside from providing access to the Coopers' property, it only provides access to property owned by appellees John and Beth Bruner. On September 8, 2009, the Coopers filed an action in Pulaski Circuit Court asking for Edward Meece Road to be declared their own private passway. The Bruners responded by contending that Edward Meece Road was a public road, and, as indicated, the Pulaski Fiscal Court also responded by arguing that Edward Meece Road was a county road.

In support of its claim that Edward Meece Road was a county road, the Fiscal Court produced 1) an aerial photograph from the Pulaski property valuation administrator's office depicting the road in question and labeling it "Edward Meece Road"; 2) records from the Pulaski department of road maintenance describing the purchase of materials between April and May of 2000, in the amount of $3,429, for the construction of a small concrete bridge on Edward Meece Road; 3) a lined sheet of paper containing a handwritten notation that a Pulaski road crew had chipped and sealed "Edward Meece" on "9–20–05" at a cost of $5,401; 4) one additional record from the Pulaski department of road maintenance indicating that a road crew had mowed the grass alongside the roadway on or about July 3, 2007; and 5) a page from the Fiscal Court's order book, dated June 30, 1976, providing in relevant part:

> Sherman Taylor appeared concerning the Union–Science Hill Road. He request [sic] the courts [sic] permission to move this road. Motion was made by

Magistrate Langdon seconded by Magistrate Huff to accept the Union–Science Hill Road for County maintenance. All Court in favor.

Furthermore, the Fiscal Court produced another one-page document, presumably from its records, stating:

10/27/00

In early 1970's there was a road where it is today and it had a gate across it at the entrance. Sherman Taylor owned the property where the gate was on the road. The Cooper's [sic] and Bertha Brumley went to court and the Judge declared the road a public passway and ordered the gate removed. In June 1976 Bill Langdon was magistrate and the road was taken into the system and was called Union Rd. A bridge was already in place at the time and graders came in and repaired the road. Ed Meece bought the property in 1976 and has been using the road since then. This information came from Edward Meece phone 423–[omitted].

Dennis Wilson

What purports to be Dennis Wilson's handwritten signature appears below where his name is typed in this document. Below that, different handwriting recites:

1. As largely summarized by Kentucky Attorney General Opinion (Ky. OAG 93–48, pursuant to KRS 177.320(2) and (3), certain funds, known commonly as "county road aid funds," are "allocated" to the counties for "construction, reconstruction, and maintenance of county roads and bridges...." "County roads and bridges," as used in KRS 177.320, are those as defined in KRS 178.010(1)(b), pursuant to KRS 179.410 and 179.010(1). In order to facilitate monitoring of the application of these funds, and in connection with its responsibilities concerning state maintained secondary and rural roads within the counties (e.g., KRS 177.320, 177.330, 177.350), the Kentucky Transportation Cabinet develops

The above statement concerns a bridge built in 2000 on the Ed Meece Road being questioned by Don Cooper.

Rocky Hurt

10/27/00

As discovery progressed in the case in the circuit court, the Fiscal Court responded in several interrogatories and requests for admissions that it did not have any Kentucky Department of Transportation Road Series maps[1] or road surveys documenting the location of its county roads. It was unaware of and could not produce any instrument, deed, resolution, or order in its records describing Edward Meece Road. Aside from its aforementioned maintenance records, it had no records relating to Edward Meece Road. Its knowledge of the beginning and termination points of Edward Meece Road was based upon the previously-mentioned photograph of Edward Meece Road from the Pulaski property valuation administrator. It did not know when Edward Meece Road had been taken into Pulaski's county road system. It was unaware of and could not produce any instrument or deed in its records describing the location of "Union–Science Hill Road." Moreover, it could not provide any county road maintenance records from 1914 to the present regarding Union–Sci-

maps known as "County Road Series Maps." The maps are presented to the fiscal court of a county for adoption, together with a proposed resolution typically indicating that the map reflects those roads within a county which have been accepted by the fiscal court as county roads. In this relation, the Office of the Kentucky Attorney General has stated that "Presumably a fiscal court would want such map to show every lawfully accepted county road within the county, in order to provide documentation that a given road is eligible for expenditure of state funds made available pursuant to KRS 177.320." See Ky. OAG 93–48.

ence Hill Road in Pulaski County, Kentucky.

The Coopers moved for partial summary judgment regarding the Fiscal Court's claim that Edward Meece Road was a county road. In their motion they pointed out that, in light of what was produced during discovery, the Fiscal Court had failed to demonstrate that it had ever "established" Edward Meece Road as a county road pursuant to KRS 178.080 or 178.115 or otherwise formally accepted Edward Meece Road into its system of maintenance.

The Fiscal Court responded with its own motion for summary judgment in which it argued that all of its proceedings were entitled to a "presumption of regularity," and that it was therefore the Coopers' burden to prove that Edward Meece Road was *not* a county road. As such, the Fiscal Court reasoned that Edward Meece Road must be a county road because the Coopers had adduced no evidence disproving that it was a county road. After considering these respective summary judgment motions, the circuit court agreed that the proceedings of the Fiscal Court were entitled to a presumption of regularity and, pursuant to an October 28, 2011 order of summary judgment, determined that Edward Meece Road was a county road. This appeal followed.

## II. Standard of Review

Summary judgment serves to terminate litigation where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kentucky Rule of Civil Procedure (CR) 56.03. Summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor. *Steelvest, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476 (Ky.1991). Summary judgment "is proper where the movant shows that the adverse party could not prevail under any circumstances." *Id.* (citing *Paintsville Hosp. Co. v. Rose,* 683 S.W.2d 255 (Ky.1985)).

On appeal, we must consider whether the circuit court correctly determined that there were no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law. *Scifres v. Kraft,* 916 S.W.2d 779 (Ky.App. 1996). Because summary judgment involves only questions of law and not the resolution of disputed material facts, an appellate court does not defer to the circuit court's decision. *Goldsmith v. Allied Building Components, Inc.,* 833 S.W.2d 378 (Ky.1992). Likewise, we review the circuit court's interpretations of law *de novo. Cumberland Valley Contrs., Inc. v. Bell County Coal Corp.,* 238 S.W.3d 644, 647 (Ky.2007).

## III. Analysis

Perhaps the best place to begin is with a brief overview of the "presumption of regularity" as it relates to fiscal courts and the establishment of "county roads" in the Commonwealth. Generally speaking, it is proper to presume that public officers have taken required procedural steps and have performed certain ministerial duties unless the record establishes otherwise. *See Hennessy v. Bischoff,* 240 S.W.2d 71, 73 (Ky.1951); *see also Shanks v. Northcutt,* 223 Ky. 138, 3 S.W.2d 208, 209 (1928). This presumption has been applied in the context of county road cases when the exclusive jurisdiction to open, close, and maintain county roads rested with the county court. *See Tarter v. Wilson,* 207 Ky. 535, 269 S.W. 715

(1925). And because the exclusive jurisdiction to open, close, and maintain county roads is now entirely vested by statute in fiscal courts, *see, e.g.,* KRS 67.080(2)(b) and KRS 178.010 *et seq.,* it can reasonably be assumed that the same presumption now works in favor of fiscal courts.

Historically, the presumption of regularity has operated to shield a judgment relating to the establishment of a county road from a collateral attack[2] in the face of an allegation that it was void for failing to follow statutory provisions relating to public notice in county road proceedings. *See Tarter v. Wilson,* 207 Ky. 535, 269 S.W. 715 (1925). One unpublished opinion has utilized it to presume that, in the absence of a showing to the contrary, the two individuals assigned to view a road and report whether the road should be discontinued, per KRS 178.070, were adequately "disinterested." *Prichard v. Carter Fiscal Court,* No. 2010–CA–001008–MR, 2011 WL 2937299 at *2 (Ky.App. July 22, 2011).[3] And, a particularly old decision utilized it to presume that the two viewers mentioned in a predecessor statute to KRS 178.080 took an appropriate oath. *Wood v. Campbell,* 53 Ky. 422, 14 B.Mon. 422, 1854 WL 3778 (1854).

■ The presumption of regularity, however, may be rebutted by actual proof that a duty was not performed. *Shanks,* 3 S.W.2d at 209. Moreover,

> [t]he general presumption that a duty has been performed by an official is subject to many qualifications. The presumption cannot be used as a substitute for proof of a definite or material fact or

as a basis in presuming irregularity in another act by the same or a different officer; nor will it avail to supply facts which the official record affirmatively shows to be absent.

*Id.* The Court illustrated this point in *Peers v. Cox,* 356 S.W.2d 768, 770 (Ky. 1962), in which the presumption was held effectively rebutted:

> Further *the county court record affirmatively shows* that the county road engineer did not execute the necessary report required by KRS 178.070. In addition, that record contains no evidence that proper notice was given as required by KRS 178.050(2), or that the county road engineer filed his affidavit as required by KRS 178.050(3). With respect to the omissions in the county court record, after a long lapse of time it might be proper to presume that the required steps had been taken. *See Burchell v. Hammons,* Ky., 289 S.W.2d 737. However, in this particular proceeding *there was positive and uncontroverted proof that such required procedural steps were not taken.*

(Emphasis added.)

■ Here, the Fiscal Court simply argues that the "presumption of regularity," in and of itself, effectively transmuted Edward Meece Road into a "county road." As seen above, the *procedure* for adopting a county road entails several duties to which the presumption of regularity has been applied. However, the Fiscal Court's ultimate *decision* to adopt a given road as a county road—and thus assert control and possession of it—must be evidenced by

---

**2.** A "collateral attack" of a judgment differs from a direct attack of a judgment; where a direct attack calls a judgment into question in a motion for a new trial, through an appeal, or through a motion to vacate, modify, or set it aside, a collateral attack is an attack made on a judgment in any other way. *Grooms v.*

*Grooms,* 225 Ky. 228, 7 S.W.2d 863, 866 (1928).

**3.** We cite *Prichard* for illustrative purposes only and do not imply that it satisfies the requirements of Civil Rule (CR) 76.28(4)(c).

proof consisting of an official order, resolution or ordinance of the fiscal court that appears of record. This point was underscored in *Illinois Cent. R. Co. v. Hopkins County*, 369 S.W.2d 116 (Ky.1963), in which the Court held that a road was not a "county road," even in the face of several years' worth of county maintenance and a substantial passage of time, in the absence of a formal order of the fiscal court accepting the road into its system of maintenance. As noted in *Sarver v. County of Allen*, 582 S.W.2d 40 (Ky.1979), there is a valid public policy behind requiring a fiscal court to evidence its acceptance of a particular road by way of an official order: A county should not be held responsible for maintenance of a road which happens to become public through a process over which it has no control. *Id.* at 41.

■ If the Pulaski Fiscal Court produced no formal order accepting Edward Meece Road into its system of maintenance, Edward Meece Road is not a "county road." It is unnecessary, therefore, to delve into the particulars of the procedures for establishing a county road enumerated in KRS 178.010 *et seq.* or any presumptions of regularity relating thereto. *Shanks*, 3 S.W.2d at 209.

Here, the Fiscal Court produced no order accepting any road named "Edward Meece Road" into its system of maintenance. We cannot presume that Edward Meece Road was the "Union–Science Hill Road" described in the Fiscal Court's order for two reasons. First, the only support that the Fiscal Court produced in favor of that proposition consists of the above-referenced "10/27/00" document signed by Dennis Wilson and Rocky Hurt, which cannot be considered anything approaching affidavit evidence because it is unsworn, recites on its face that it was not

made based upon personal knowledge, and it was unaccompanied by anything, authenticated or otherwise, documenting the proceedings it references. *See* CR 56.05. Second, as they currently appear (and as they appeared in 1976), KRS 179.330(1) and (2) require an additional order from the Fiscal Court, also entered of record, to authorize changing the name of a county road (*e.g.*, from Union–Science Hill Road to Edward Meece Road). No such order appears in this record. In short, the Pulaski Fiscal Court has failed to demonstrate that Edward Meece Road is a county road. Consequently, the Coopers were entitled to partial summary judgment on this issue, having filed a cross-motion to that effect.

■ An argument that is raised by the Bruners in this appeal is that even if Edward Meece Road is not a county road, this Court should alternatively consider it to be a public road by prescription and affirm on that basis. In support, they point out that their own summary judgment motion included an alternative argument that Edward Meece Road was also a public road by prescription; that the circuit court's order recited that summary judgment was granted in the Fiscal Court's favor *and* the Bruners' favor; and, thus, the circuit court's judgment necessarily incorporated a separate finding that Edward Meece Road is also a "public road."

■ As opposed to "county roads," "public roads" do not require any kind of formal establishment. And, as the Bruners contend, a roadway or passway may become a "public road" giving the public a right to an easement by prescription through adverse use in excess of the statutory 15–year period.[4] *See, e.g., Cummings*

4. Public roads may also be formally dedicated and presumed to exist pursuant to the terms of KRS 178.025, or come into being under a

*v. Fleming County Sportsmen's Club, Inc.,* 477 S.W.2d 163, 167 (Ky.1972); *Whilden v. Compton,* 555 S.W.2d 272, 274 (Ky.App. 1977); *Watson v. Crittenden County Fiscal Court,* 771 S.W.2d 47, 48 (Ky.App.1989) ("a public road may be acquired by prescription only upon (1) fifteen years public use and (2) a like number of years of control and maintenance by the government"). Long continued uninterrupted adverse use of a passway by the public will create an implied acceptance of a dedication of the passway as a public road. *See Freeman v. Dugger,* 286 S.W.2d 894, 896 (Ky.1956). The adverse use must be of the same character, continuity, and duration as is necessary for creation of a private easement, which in turn requires open, hostile, actual, notorious, and continuous use. *See Cummings,* 477 S.W.2d 163; *Bell v. Smith,* 246 Ky. 470, 55 S.W.2d 398 (1932).

▮▮▮▮ "Easements are not favored and the party claiming the right to an easement bears the burden of establishing all the requirements for recognizing the easement." *Carroll v. Meredith,* 59 S.W.3d 484, 490 (Ky.App.2001). As the Coopers pointed out below and in their brief in this appeal, the Bruners have never cited anything of record, aside from their own pleadings, indicating that Edward Meece Road is or qualifies as a public road. Pleadings are not evidence. *Educational Training Systems, Inc. v. Monroe Guar. Ins. Co.,* 129 S.W.3d 850, 853 (Ky.App.2003). And, unless and until the Bruners have properly shouldered their initial burden of establishing the apparent non-existence of any issue of material fact (*i.e.,* by providing evidence demonstrating that "Edward Meece Road" is a "public road"), the Coopers are not required to offer any evidence to rebut their contention. Accordingly, the Bruners are

theory of dedication by estoppel. *Whilden,* 555 S.W.2d at 274.

not entitled to summary judgment on this issue. *See Porter v. Johnson County Judge/Executive,* 357 S.W.3d 500, 504 (Ky. App.2010).

In sum, the circuit court's judgment is reversed as it relates to the issue of whether Edward Meece Road is a "county road," and the circuit court is directed to enter partial summary judgment in favor of the Coopers in this respect. To the extent that the circuit court's judgment could likewise be interpreted as adjudicating Edward Meece Road as being a public road or easement, the circuit court's judgment is likewise reversed and this matter is remanded for additional discovery and findings regarding that issue.

## APPEAL NOS. 2011–CA–002272–MR and 2012–CA–000187–MR

### I. Factual and Procedural History

The road that is the subject of this appeal is generally known as "Taylor Cemetery Road." This road was located entirely within the boundaries of one tract of farmland in Pulaski County near Lake Cumberland formerly owned by Coral and Mae Keeney. The Keeneys' four adult children, Grace Cary, Betty Smith, Linus Keeney, and Mary Stevenson (along with their respective spouses), divided this tract into four smaller tracts between themselves on or about June 25, 1998. Thereafter, the road traversed or extended to each of their respective tracts. Grace's tract also encompasses a small family cemetery generally known as "Taylor Cemetery." While no road leads directly to Taylor Cemetery, this road has been generally referred to as "Taylor Cemetery Road" because it is the closest road to the cemetery and individuals have used this road to visit the cemetery.[5] In any event, Betty

5. According to the June 17, 2001 survey of the Coral and Mae Keeney Estate, this road

and Grace testified in their depositions that Taylor Cemetery Road was originally a dirt farm road with ruts. It was susceptible to mud holes when it rained, partially washed away in some places, and that it was formerly wide enough for only one vehicle.

As to the course and distance of this road, the record in this matter contains a June 17, 2001 survey of the four ,smaller tracts that were divided among Coral and Mae Keeney's children. The deeds to the tracts belonging to Grace, Linus, Betty, and Mary each refer to this survey, and the survey describes this road in greater detail. The distance between where this road begins at Linus Keeney Road and dead-ends at Mary's property is or closely approximates 5000 feet, or .947 miles.[6] As to the road's course,[7] it begins at an intersection with Linus Keeney Road and continues in a southeasterly direction through property owned by Linus. It continues in that direction where it meets with and passes "Paul Perry Road," which is a private, gated road that separates Linus's tract from Grace's tract and leads to a subdivision.[8] The road then continues through Grace's tract and, after some dis-

tance, turns in a northeasterly direction. Thereafter, the road turns in a more northerly direction through Betty's tract, and then dead-ends at the boundary between Betty's tract and Mary's tract, where the road meets at an approximately 90–degree angle with a 15–foot wide private roadway that Betty and Mary built between their adjoining property lines.

Sometime in 2001, Pulaski County officials placed a "Taylor Cemetery Road" sign where this road meets with Linus Keeney Road.[9] Sometime between 2001 and 2003, a Pulaski road crew spent three or four days using bulldozers, a road grader and manpower ditching, leveling, and graveling the road and widening it to thirty feet. Grace testified that the County also "put in at least two tiles [in the road]" at that time. Grace also testified that, thereafter, the county occasionally mowed the area around the road. Sometime in 2005, another Pulaski road crew then chipped and sealed the road from where it began at Linus Keeney Road to where it dead-ended at Mary's property.[10]

Grace testified in her deposition that shortly after Pulaski County chipped and

comes within about 500 feet of Taylor Cemetery as it traverses Grace's tract.

6. The survey and deeds do not describe the width of this road.

7. Linus's deed also describes the course of the road in this matter and indicates that one end of the road is located between Betty's and Mary's tracts. Linus's deed was signed and acknowledged by Grace, Linus, Betty and Mary.

8. A reference to "Paul Perry Road" does not appear on surveyor Hudson's plat. In Mary Stevenson's deposition, however, she testified that it was located, and actually constituted, the dividing line between Linus Keeney's and Grace Cary's respective tracts indicated on Hudson's plat, at a point about 2400 feet from where "Taylor Cemetery Road" begins at Li-

nus–Keeney Road. Likewise, Grace's deed describes an unnamed road beginning at "Paul Perry's line" dividing Grace's tract from Linus's tract in that location.

9. There is no record of exactly when or where this sign was erected, but Grace testified in her deposition that this sign appeared sometime in 2001.

10. The record does not directly specify any of these dates. Grace testified that when the county chipped and sealed the roadway, it prompted her to find the September 5, 2001 petition, mentioned *infra*, "four years after the fact." Smith also testified that the time between when Pulaski leveled and graveled the road and when it later chipped and sealed the road, was "a few years I think, a couple of years at least before they chipped and sealed, maybe even longer than that."

sealed Taylor Cemetery Road in 2005, she visited the county courthouse and located documents verifying that the County considered Taylor Cemetery Road to be part of its system of county roads. Afterward she visited the county judge/executive and expressed her disagreement. According to her, the county judge/executive then advised her "to get a lawyer." Three years later on September 12, 2008, Grace and her husband, Ronnie (collectively, "the Carys"), filed a complaint in Pulaski Circuit Court essentially asking for a judicial declaration that they had the right to exclude and enjoin others, including Pulaski County, from using or maintaining that part of Taylor Cemetery Road bordering their tract. To that end, their complaint named two sets of defendants: 1) the Pulaski Fiscal Court; and 2) the remainder of the above-captioned appellees in this matter, who constitute the other owners of property bordering the entirety of the road and additional interested parties.[11]

In its answer, the Pulaski Fiscal Court asserted that the Carys had no right to exclude others from using the part of Taylor Cemetery Road bordering their tract because it had adopted the entirety of the road as a "county road." Over the course of discovery, the Fiscal Court produced two documents in support of its claim that Taylor Cemetery Road was a county road: 1) a page from its order book dated September 11, 2001; and 2) a document from its records entitled "road request to be taken into county maintenance system." As it relates to "Taylor Cemetery Road," the page from the order book provides:

> Motion made by Magistrate Cothron and seconded by Magistrate Hansford to extend Omega and Lake Shore Dr. 180 ft. and 30 ft. right of way. Taylor Cem-

etery Road accept .8 mile and 30 ft right of way. All in favor. Motion carried.

The "road request" document describes "Taylor Cemetary [sic] Road" in greater detail. It specifies the length of this road as "8/10 mile," the width as "30'," its "connecting roads" as "Linus Keeney Rd–Paul Perry Rd.," and the number of homes served by the road as "1 present, 1 planning soon (6 hopefuls)." It states the names of the "persons submitting request" as "Charles D. Stevenson, Noel Stevenson, Monika Stevenson, Lora Stevenson–O'Brohta, Robert J. O'Brohta, Alex Godsey, Joey Godsey, Charles Alan Stevenson, Beverly Stevenson, Anthony Stevenson, Gayle D. Davis, Greg Davis, Mary Stevenson, Betty Smith, Bill Smith, Paul Perry, and Barbara Perry." Near the bottom of this document, it notes that an inspection was conducted on "9/5/01" by "Mag. Isaacs & Hasford, Rocky Hurt," and that "Isaacs Hansford Rocky Committee Recommends Accepting This Road Into The Road Maintenance System." Notably absent from the road request document are signatures from Linus Keeney, his spouse, or the Carys who collectively own two of the four tracts abutting the road.

The Carys moved for summary judgment against the Fiscal Court, arguing that the Fiscal Court had no title or interest in Taylor Cemetery Road because the Fiscal Court had failed to put forth any evidence demonstrating that it had "established" Taylor Cemetery Road as a "county road" through following the provisions of either KRS 178.080 or KRS 178.115. In a response and cross-motion for summary judgment, the Fiscal Court declined to explain how it had gone about establishing Taylor Cemetery Road as a county road or acquiring any title or interest relating

---

11. Among this group are Warren Shannon Thompson, Warren Cook Thompson, and James P. Thompson. The Thompsons' standing in this matter is uncontested, but the nature of their interests in this matter is not specified in the record.

thereto, and it produced no further documentation in that regard beyond its order and the above-referenced petition. Nevertheless, it argued that it was entitled to a presumption that all of its proceedings were conducted according to law; therefore, it was actually the Carys' obligation to prove Pulaski County did not properly establish the road as a county road or otherwise comply with any of the provisions of KRS 178.010 *et seq.* Furthermore, the Fiscal Court argued that Grace was estopped from denying its possession and control of "Taylor Cemetery Road" as a county road and, alternatively, that the applicable statute of limitations barred Grace's suit.

After considering these motions, the circuit court agreed with the Fiscal Court. Pursuant to an October 27, 2011 order of summary judgment, the circuit court held that Taylor Cemetery Road was a county road on two separate bases: 1) the Carys had failed to rebut the fiscal court's "presumption of regularity" by proving that the road was not a county road; and, alternatively, 2) the Carys were equitably estopped by their conduct from denying that the road specified in the Fiscal

Court's order was not a county road. This appeal followed.

## II. Analysis

### 1. "Taylor Cemetery Road" has been "established" as a "county road."

We have previously discussed the standard for reviewing summary adjudications. On appeal, Grace continues to argue that she is entitled to the exclusive possession of the portion of Taylor Cemetery Road bordering her tract and is therefore entitled to prevent all others from using it. The breadth of her arguments in support of that proposition are devoted entirely to whether, prior to when it entered its September 11, 2001 order, the Fiscal Court followed the jurisdictional public notice requirements relating to the procedures for "establishing" Taylor Cemetery Road as a county road described in either KRS 178.080 or KRS 178.115(1).[12]

The Carys' arguments regarding the jurisdictional notice specified under each of those establishment procedures are largely resolved by *Tarter v. Wilson,* 207 Ky. 535, 269 S.W. 715 (1925), in which certain or-

---

**12.** If KRS 178.080 is utilized for the establishment of a county road, the public notice requirements specified in KRS 178.050 must be followed. KRS 178.050 provides:

> (1) No county road shall be established or discontinued, or the location thereof changed unless due notice thereof has been given according to the provisions of this chapter.
>
> (2) Notices and advertisements for the establishment, alteration or discontinuance of any county road, bridge or landing, and all notices and advertisements for the letting of contracts for construction or maintenance of county roads and bridges under the provisions of this chapter shall be published pursuant to KRS Chapter 424 by the county road engineer.

Conversely, if the procedure described under KRS 178.115(1) is followed, KRS 178.050 has no application. *Thompson v. Fayette County,*

302 S.W.2d 550, 552 (Ky.1957). KRS 178.115(1) provides:

> Whenever the fiscal court of any county deems it to be in the best interest of the county to open, establish or alter the location of any public road, street, alley, ditch, culvert, bridge or similar public way or structure in the county, the fiscal court shall adopt a resolution setting forth the necessity for the public road or structure, and thereupon the public road or structure shall be deemed opened, established or altered, as the case may be, on behalf of the county. A certified copy of the resolution shall be posted at the courthouse door of the county within five (5) days after its adoption and a certified copy of the resolution shall be posted by the county road engineer of the county along or at the proposed road or structure within five (5) days after its adoption.

ders and proceedings in a county court regarding the alteration of a county road were also collaterally attacked because the face of the county court's record and orders did not disclose whether the requisite statutory notice had been given. The trial court reasoned in *Tarter* that the county court had acted without jurisdiction in authorizing the alteration; held the proceedings and orders void; and granted injunctive relief because the evidence failed to show that proper and legal notice had been given of the application to the county court before the county court authorized the alteration. *Id.* at 716. Thereafter, the appellate Court reversed. Analogizing to *Decker v. Tyree,* 204 Ky. 302, 264 S.W. 726 (1924), which addressed the same issue of public notice in the context of ferry franchises and privileges, the former Court of Appeals held that "as the records of the county court did not affirmatively show the want of jurisdiction, the jurisdictional facts will be presumed to have existed on the collateral attack raised by the demurrer."

*Tarter* was later cited with approval in *Burchell v. Hammons,* 289 S.W.2d 737, 738 (Ky.1956), where this rule of presumption was given a more detailed explanation:

> The policy behind this rule seems to be to protect the courts and the validity of their judgments and to secure property rights acquired in good faith and based thereon, against the loss of papers or the disappearance of records which often happens over a long period of time. No doubt many judgments really void are protected by these presumptions after the lapse of a number of years.

> This Court cannot be said to be in full sympathy with this rule at the present time in view of an apparent violation of natural justice involved in condemning a party who has had no opportunity to present his defense, or stronger yet, no knowledge that his rights were in jeopardy. It is quite apparent to our minds that in following such a rule injustices will be done. The reasoning behind the rule is further weakened in the light of the holdings, in regard to judgments of sister states, that the question of jurisdiction may be inquired into, and a want of jurisdiction over the person shown by evidence, and that this may be done even if it involves the contradiction of a recital in the judgment record. Freeman on Judgments, Vol. 1, Sec. 375–a; Vol. 3, Secs. 1366, 1371, 1436; 50 C.J.S., Judgments, § 893, p. 502 et seq.; *Hamm v. Hamm,* 30 Tenn.App. 122, 204 S.W.2d 113, 175 A.L.R. 523, footnote 4, at page 536 (1947).

. . .

> Assuming, without deciding, that the rule should be that extrinsic evidence is admissible in a collateral attack to show that a judgment is void, we feel that such evidence to overcome the presumption of verity of the record must be of a clear and convincing nature. The appellees having defended their title upon the ground that the prior judgment was void, must stand on the quality of their proof. Their proof consisted solely of the testimony of Richard Hammons, the defendant in the prior suit, that he was never served with process and that he never appeared before the court. *It is our opinion that this bare statement does not constitute clear and convincing proof sufficient to overcome the presumption of validity of this judgment which has remained unquestioned for more than ten years.*

*Id.* at 739–40 (emphasis added.)

We have not found any authority subsequent to *Tarter* departing from this rule of

presumption under this set of circumstances,[13] and the Carys have not cited any. Their challenge of the Fiscal Court's September 11, 2001 order over seven years after it was entered can only be characterized as a collateral attack. Moreover, the Carys have not affirmatively demonstrated outside of Grace's own self-serving testimony that the Fiscal Court acted without jurisdiction when it entered its order. Consequently, the Carys' arguments regarding notice have no merit whether they relate to KRS 178.080 or 178.115. In the absence of a positive showing to the contrary, we will presume that "Taylor Cemetery Road" was effectively "established" by the Fiscal Court to the extent specified in its order.

## 2. "Taylor Cemetery Road" has been "taken" by Pulaski County to the extent specified in its order of acceptance.

For the most part, the statutes regarding establishment of county roads are irrelevant to the issue of whether the Carys or Pulaski County are entitled to exclusively possess any part of Taylor Cemetery Road. The former Court of Appeals touched upon the reason in *Thompson v. Fayette County*, 302 S.W.2d 550, 551 (Ky. 1957):

> We are confronted with the effect of the resolution of the Fiscal Court. Appellees assert the action taken was simply a first step in the opening of this street prior to condemnation, and the resolu-

---

**13.** Two Kentucky cases, *Illinois Cent. R. Co. v. Ward*, 35 S.W.2d 863, 866, 237 Ky. 478, 478 (1931) and *Peers v. Cox*, 356 S.W.2d 768, 769 (Ky.1961), each contrasted *Tarter* with another decision, *Potter v. Matney*, 165 Ky. 266, 176 S.W. 987 (1915), to express that there was some confusion in the caselaw involving the nature of the presumption of validity to be accorded to county court decisions regarding county road disputes. To summarize, *Potter* held that a county court had failed to establish a county road because no order establishing the road existed and because a county court was a "court of limited jurisdiction." Thus, its jurisdictional facts, particularly those relating to notice, were required to affirmatively appear of record and could not be presumed. *Potter*, 176 S.W. at 988–89. *Potter* was briefly cited once for this latter proposition in *Jones v. Avondale Heights Co.*, 243 Ky. 135, 47 S.W.2d 949, 950 (1932), but does not appear to be dispositive of the outcome in that case, nor did *Jones* distinguish or consider *Tarter*.

Conversely, *Tarter* held that even though county courts were considered courts of limited jurisdiction, their judgments of record, made within the exercise of their primary or exclusive areas of jurisdiction (for example, the granting of ferry franchises, probate pro-

ceedings, and the establishment of county roads) were "entitled to the same immunity from collateral attack as are judgments of courts of superior and general jurisdiction." *Tarter*, 269 S.W. at 716. This rule of immunity from collateral attack was dispositive of later cases involving county court judgments made within the county court's exclusive jurisdiction. *See, e.g., Maynard v. Chrisman*, 301 Ky. 631, 192 S.W.2d 818, 820 (1946) (appointment and removal of testamentary trustees); *Adkins v. Ashland & Ironton Transfer & Ferry Co.*, 210 Ky. 532, 276 S.W. 131, 132–33 (1925) (judgment regarding ferry privileges not void even though record does not demonstrate whether jurisdictional notice requirements complied with); *Smith v. Graves*, 268 Ky. 116, 103 S.W.2d 673, 674–75 (1937) (same).

Assuming *Potter* has not been overruled *sub silentio* and that two opposite rules of law continue to exist on this subject, we believe the stronger precedent supports the rule of presumption stated in *Tarter*. We are authorized to follow it. This jurisdiction has not favored the overruling of precedent by implication. In some instances, however, it becomes necessary and in that event the later decision and more recent precedent following it will prevail. *Smith v. Overstreet's Adm'r*, 258 Ky. 781, 81 S.W.2d 571, 572 (1935).

tion itself did not effect a 'taking' of property rights. This position is sound. Surely no street came into being upon the passage of the resolution. It seems clear from a reading of KRS 178.080, 178.115 and 178.120 that the 'establishment' of the street constitutes a designation of it, and must necessarily take place prior to acquisition of the property involved. Neither the Fiscal Court nor any one else could proceed to acquire land for a passway by condemnation or otherwise until the metes and bounds thereof were fixed. This manner of proceeding was recognized in *Carrigan v. Fiscal Court of Fulton County,* 289 Ky. 562, 159 S.W.2d 420 (1942). The resolution of the Fiscal Court must be construed as identifying the new roadway ultimately to be established when necessary further procedural steps have been taken. Therefore the resolution, standing alone, took nothing from appellants. Appellants point out that after the resolution was adopted the county road engineer cut a fence on the lot in question and spread gravel thereon, the suggestion being that the roadway sought to be established by the resolution has actually come into being. It is obvious that the resolution did not authorize such action by the engineer and if any rights of appellants are being impaired, it is not by the present appellees.

■ As indicated in *Thompson,* an order merely "establishing" a county road has no bearing upon whether a county has the right to possess, control, or maintain real property constituting a road; it "simply identif[ies] the new roadway ultimately to be established when necessary further procedural steps have been taken." *Id.* By contrast if a county establishes a county road and thereafter authorizes and proceeds with the construction of a public road through privately owned property

without first securing title or an easement to it, the county has not merely "established" a county road; it has also committed a "taking." *See McDonald v. Powell County,* 199 Ky. 300, 250 S.W. 1007 (1923); *Harlan County v. Cole,* 218 Ky. 819, 292 S.W. 501, 503 (1927):

> In the case at bar the county had appropriated the land to a public use, and the state now has full control and possession of the road, maintaining it for public use. The law places the burden of obtaining rights of way for public use upon the county, and the fact that it obtained the right of way in this instance illegally makes it none the less the appropriation of appellee's land.

Contrasted with what occurred in *Thompson,* the Pulaski Fiscal Court clearly understood from its resolution to "accept" Taylor Cemetery Road that a pubic road had indeed come into being; that it was therefore authorized to open it to the public and adopt it into its system of maintenance; and, that it was authorized to widen, gravel, ditch, and chip and seal whatever it deemed to be Taylor Cemetery Road without the necessity of following any additional procedures, such as receiving title or an easement to the land by gift, purchase agreement, or condemnation proceedings.

■ As in Appeal No. 2011–CA–002274, much was argued below about the "presumption of regularity" to be accorded to the acts of public officials and whether this presumption should excuse Pulaski from having to prove that it complied with the requisite procedures for acquiring title or any kind of interest in Taylor Cemetery Road. As we previously noted, it is generally proper to presume that public officers have taken required procedural steps and have performed certain ministerial duties unless the record establishes otherwise. *See Hennessy v. Bischoff,* 240 S.W.2d 71,

73 (Ky.1951). However, "[t]he general presumption that a duty has been performed by an official is subject to many qualifications. The presumption cannot be used as a substitute for proof of a definite or material fact or as a basis in presuming irregularity in another act by the same or a different officer; nor will it avail to supply facts which the official record affirmatively shows to be absent." *Shanks v. Northcutt*, 223 Ky. 138, 3 S.W.2d 208, 209 (1928).

■ As indicated in *Thompson* and by KRS 178.120 *after* a fiscal court deems it to be in the best interest of the county to open establish, construct, alter or repair any public road, street, alley, ditch or bridge of the county, it must secure the land necessary for that purpose through a contract with the owner of the land or through gift or condemnation proceedings. The county clerk is then required by statute to keep a complete record of all documents of title to rights-of-way, whether acquired by gift, purchase or condemnation. KRS 178.320. In its admissions and responses to interrogatories, the Fiscal Court stated that neither it nor the Pulaski County Clerk had instruments of title regarding this road. It also produced no purchase agreements or indicia of a gift or condemnation proceedings in that regard, aside from the aforementioned petition (which is missing the signatures of Grace, Linus, and their respective spouses).

■ Instead, the Fiscal Court spent much of its effort below, particularly in its motion for summary judgment, arguing that it might have gone about acquiring fee simple title to this roadway in 2001 pursuant to the dedication procedure described in KRS 178.400 through 178.425. Furthermore, the circuit court's order indicates, albeit in a footnote, that this might have actually occurred. Those statutes, as they appeared in 2001, only applied to "an unincorporated area in a county containing a city of the first class or a consolidated local government." *See, e.g.*, KRS 178.405 (prior to amendment on July 13, 2004). Pulaski County did not meet either of these conditions in 2001, and those statutes therefore had no application.

The Fiscal Court argued that it might have gone about maintaining this road pursuant to KRS 179.470(1). However, that statute only would have allowed Pulaski County to improve or maintain "a street or road of a subdivision established by a *recorded plat* that dedicates the street or road to public use." (Emphasis added). Here, the record in this matter indicates that the above-referenced June 17, 2001 survey and plat of the Coral and Mae Keeney Estate has never been filed or recorded with the Pulaski County Clerk. Specifically, the survey itself bears no indication that it was ever recorded. In their 2009 motion for summary judgment filed below, part of the relief requested by the Thompsons was for "[a]n order that the Coral and Mae Keeney Estate plat be recorded, so the exact location of the road will always be known."

The Fiscal Court also argued that it might have been maintaining Taylor Cemetery Road pursuant to KRS 179.375, which permits counties to "accept donations in fee to roads and driveways used by the public in connection with ... cemeteries[.]" A "donation in fee" is a gift of title, though; as stated earlier, there is no indication in any of the records presented, or in any instruments of title that the county clerk was required by statute to keep, that title to Taylor Cemetery Road was ever gifted. For these reasons, the "presumption of regularity" simply cannot demonstrate that Pulaski County obtained any kind of interest in Taylor Cemetery Road by means other than a taking; to do otherwise would be to presume irregularity in

the Fiscal Court's proceedings. *Shanks*, 3 S.W.2d at 209.

As such, this case is not merely about whether the Fiscal Court established a county road to be constructed, maintained, or repaired sometime in the future. Having resolved that question in favor of the Fiscal Court, this case is to a much larger extent about whether the Fiscal Court chose to take property for a public purpose—which it permanently and unequivocally did—and whether the law will now provide Grace a remedy to recover that property, assuming that she owned it in the first place.

■■■■ On that note if each of the owners of land abutting Taylor Cemetery Road actually owned in fee that part of Taylor Cemetery Road bounding their respective properties, as urged by Grace, the question is: What remedy would be available to them for recovering possession? Sections 13 and 242 of the Kentucky Constitution require just compensation when private property is taken for public use. Ordinarily, the law of eminent domain requires that prior to such a "taking," the land must be properly condemned. *Jones v. Com., Trans. Cabinet, Dept. of Highways*, 875 S.W.2d 892, 893 (Ky.App.1993). The gravamen of Grace's action to reassert ownership in Taylor Cemetery Road is, thus, one sounding in "reverse condemnation." Reverse or inverse condemnation is "the term applied to a suit against a government to recover the fair market value of property which has in effect been taken and appropriated by the activities of the government when no eminent domain proceedings are used." *Commonwealth, Natural Resources and Environmental Protection Cabinet v. Stearns Coal and Lumber Co.*, 678 S.W.2d 378, 381 (Ky. 1984); *see also Commonwealth, Dept. of Highways v. Gilles*, 516 S.W.2d 338, 339 (Ky.1974). As further explained in *Wit-*

*beck v. Big Rivers Rural Electric Cooperative Corp.*, 412 S.W.2d 265, 269 (Ky.1967) (overruled on other grounds in *Commonwealth, Dept. of Highways v. Stephens Estate*, 502 S.W.2d 71, 73 (Ky.1973)),

where an entity possessing the power of eminent domain prematurely enters upon the premises of the condemnee, the exclusive remedy of the landowners is based on Kentucky Constitution, Section 242, which provides that "just compensation for property taken" shall be made. This remedy is frequently referred to as "reverse condemnation." The measure of damages is the same as in condemnation cases.

■■■■ Rather than opting to receive damages, a plaintiff in a reverse condemnation action may instead ask for equitable or injunctive relief, including the recovery of the property at issue. *See Stearns*, 678 S.W.2d at 381 (citing *Keck v. Hafley*, 237 S.W.2d 527 (Ky.1951)); *City of Whitesburg v. Lewis*, 255 Ky. 91, 72 S.W.2d 1019 (1934).

■■■■ There are, however, limits on a landowner's right to bring a reverse condemnation action against the governmental agency that has committed a taking. "Recovery [is] permitted ... on the theory that when the acts of the state constitute[ ] a taking of property, the law [implies] an agreement to pay for it." *Curlin v. Ashby*, 264 S.W.2d 671, 672 (Ky.1954). Because the obligation is viewed as an implied promise to pay, the action must be brought within five years from the date of the accrual of the action (*i.e.*, the date of the "taking") pursuant to KRS 413.120(1). Ky. L. of Damages § 17:19 (2011); *Jones*, 875 S.W.2d at 893. Moreover, inasmuch as the landowner seeks to use a reverse condemnation proceeding to recover the property that has been taken,

where ... the land has been taken for street purposes, and money for its im-

provement is expended, and no action is taken by the owner to prevent the taking or improvement . . . the owner is not entitled to recover the property, but . . . an action for damages is his sole remedy.

*Lewis,* 72 S.W.2d at 1019–20 (citing *Cole,* 292 S.W. 501).

■ Here, even if the five-year statute of limitations has not expired on the Carys' claim to recover possession from Pulaski of that part of Taylor Cemetery Road bordering their tract, we agree with the circuit court's additional conclusion that the Carys are now estopped from recovering exclusive possession of that part of the road.[14] The uncontroverted evidence establishes that Grace observed, made no objection to, and acquiesced in the improvement and construction of Taylor Cemetery Road by county road officials at all relevant times. As noted by the circuit court,

> Ms. Cary's testimony on this particular point is unassailable. She learned of the county's maintenance of the roadway long before initiating this litigation:
>
> Q. Now at the time the County road crew was out working on the roadway did you, did you know that they were there at that time?
>
> A. I did not know it was County.
>
> Q. Okay, did you make someone lunch at that time when they were working on the roadway?
>
> A. Yes.
>
> Q. Who did you believe was working on the roadway?
>
> A. Probably County.
>
> . . .
>
> Q. Okay. When, when the County initially came in and worked on it the day you gave them the sandwiches what did they do to the roadway at that time? What improvements did they make?
>
> A. Uh, they graded it, ditched it, put in at least two tiles. One went across and one went for a gate.
>
> Q. Did they gravel it at that time?
>
> A. Yes, they graveled.[FN 9]

[FN 9] Ms. Cary also testified that she had no objection to the road being graveled.

> Q. Okay. When did, um, when did you first learn that the county was maintaining the roadway?
>
> A. When they chipped and sealed it.
>
> Q. Now how long would that have been after they were there and you served them lunch?
>
> A. I think a couple of years.
>
> Q. Did you hire a lawyer at that time?
>
> A. Not at that time.

Thus, Ms. Cary was aware that the public funds were being expended to improve and maintain Taylor Cemetery Road. Therefore, regardless of any possible error made by the Fiscal Court in adopting the Taylor Cemetery Road into the county system, the Carys lost their right to oppose the improvement to the road when they allowed it to be mowed, graded, ditched, graveled, chipped and sealed and allowed "at least two tiles" to be put in.

In sum, the Pulaski Fiscal Court expressed its intention to take "Taylor Cemetery Road" into its system of maintenance through entering its September 11, 2001 order. It took control and possession of the land constituting what it deemed to be "Taylor Cemetery Road" when, thereafter, it opened the road to the public and expended public funds to widen it, grade it, gravel it, ditch it, mow it, and chip and seal

---

14. As indicated earlier in this opinion, Grace has made no claim for the fair market value of what she alleges was her portion of this road; nor, for that matter, did the circuit court address such a claim.

and otherwise maintain it over the course of the next several years. When the Carys chose not to assert whatever rights they had until they filed their suit in 2008, they precluded themselves from contesting Pulaski's right to control, possess, and maintain "Taylor Cemetery Road" as a county road.

### 3. Regarding Appeal No. 2012–CA–000187–MR, the Carys were properly directed to remove their gate from Taylor Cemetery Road.

The final issue raised by the Carys relates to another order entered by the circuit court on December 29, 2011, also the subject of this consolidated appeal. By way of background, after the circuit court entered its order of October 27, 2011, the Carys erected a gate across a portion of Taylor Cemetery Road bounding the northwest portion of their tract, thereby blocking off that part of Taylor Cemetery Road providing access to the Stevensons' and Smiths' tracts. The Stevensons and Thompsons (but not the Pulaski Fiscal Court) moved to hold Grace in contempt for doing so, and to enjoin her from maintaining the gate. In a separate order of December 29, 2011, the circuit court consequently ordered Grace to remove the offending gate. Now on appeal, Grace contends that even if Pulaski County did accept Taylor Cemetery Road into its system of maintenance as a "county road," she was nevertheless entitled to place her gate across that part of Taylor Cemetery Road because 1) the Fiscal Court's order recites that the county accepted a right-of-way measuring ".8 mile[s]" (literally 4224 feet); and 2) she erected her gate across the road 268 feet beyond that point, in a place where the road continues to form part of the boundary of her tract.

Taylor Cemetery Road does not extend beyond .8 miles, absent a fiscal court order to that effect; therefore, the circuit court's order did not operate to extend the length of that road. Nevertheless, the Stevensons and Thompsons had at least one basis of their own, amply supported by the record before us, for asking the circuit court to order Grace to remove her gate, *i.e.*, that Grace's gate constituted a private nuisance. Grace's deed and the deeds of all of her siblings each reference the June 17, 1998 survey discussed above, and that survey depicts the road in question as closely approximating 5000 feet in length, passing the entirety of the Carys' tract, and dead-ending at the Stevensons' property. As stated in *Marshall v. Kent*, 210 Ky. 654, 276 S.W. 563, 565 (1925),

> There is a rule of law, adopted in this state almost from its foundation, that a conveyance of land by reference to a map or plat gives to the grantee a right of way over any ways shown on that map which bound or touch the land conveyed, as an easement appurtenant to that land. This is a private right, even though the ways be intended for public use, and it exists even though there be no acceptance or improvement of such ways by the public authorities, and is not extinguished by the abandonment of the public right. Nor is the recording of the map necessary.

Thus, Grace's gate across Taylor Cemetery Road—which she erected without any of her adjoining neighbors' consent—amounted at the very least to a private nuisance. Her neighbors were therefore entitled to enjoin it as such; consequently, we find no error.

### 4. Regarding Cross–Appeal No. 2012–CA–000226–MR, the circuit court did not abuse its discretion in refusing to hold the Carys in contempt of court.

As discussed above, the Stevensons and Thompsons moved the circuit

court to hold the Carys in contempt for erecting a gate across Taylor Cemetery Road. In their cross-appeal, the Stevensons and Thompsons now assert that the circuit court erred because it merely ordered the Carys to remove their gate and that the circuit court should have also held them in contempt. It is unclear what relief the Stevensons and Thompsons are now requesting. In their motion, they asked the circuit court to order the gate in question to be removed, which the court did. Aside from that, they simply made—and continue to make on appeal—a vague additional request for "the Court to impose an appropriate penalty against [the Carys] for their contempt[.]"

▮▮▮ A court has broad discretion when exercising its contempt power. *Meyers v. Petrie*, 233 S.W.3d 212, 215 (Ky. App.2007). A court's discretion in this regard necessarily encompasses the discretion to determine when to apply its contempt powers and when to refrain from imposing sanctions and fines. *See Smith v. City of Loyall*, 702 S.W.2d 838 (Ky.App. 1986). Absent an abuse of the court's discretion we will not disturb its decision on appeal. *Petrie*, 233 S.W.3d at 215. And, an abuse of discretion implies action that was arbitrary, unfair, unreasonable, or not supported by sound legal principles. *Id.*

Here, it is evident that the circuit court considered the equities of the parties and the posture of this case when it arrived at its decision to merely order the removal of the gate without an order of contempt.

There is nothing unfair about that decision, and we will not second-guess the circuit court's solution to this problem. We do not, therefore, find error.[15]

## CONCLUSION

For these reasons, the summary judgment of the Pulaski Circuit Court relating to Appeal No. 2011–CA–002274–MR is REVERSED and REMANDED for the additional proceedings specified in this opinion. The Pulaski Circuit Court's judgments relating to Appeal Nos. 2011–CA–002272–MR and 2012–CA–000187–MR and Cross–Appeal 2012–CA–000226–MR are AFFIRMED.

ALL CONCUR.

---

**15.** On appeal, the Stevensons and Thompsons have also attempted to supplement their arguments, without citation to the record, by stating that on some unspecified date Ronnie Cary fired a shot at Linus Keeney's son to keep him away from the gate. The record contains nothing supporting this assertion, nor does the record indicate that it was made below or considered by the circuit court. Accordingly, we will not consider it in this appeal. *Barnard v. Stone*, 933 S.W.2d 394, 396 (Ky.1996).